AO 106 (Rev. 04/10)  Application for a Search Warrant

**FILED**

SEP 0 4 2018

CLERK OF THE COURT
U.S. DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

# UNITED STATES DISTRICT COURT

for the

Central District of Illinois

In the Matter of the Search of

*(Briefly describe the property to be searched
or identify the person by name and address)*

SILVER IPHONE AND BLACK SAMSUNG CELLULAR
PHONES POSSESSED BY CALVERT DAVIS ON
AUGUST 8, 2018

)
)
)
)
)
)
)

Case No.  18-MJ- 7152

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A.

located in the _____Central_____ District of _____Illinois_____ , there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. 846 | Attempted distribution of controlled substances. |

The application is based on these facts:

See affidavit of FBI Special Agent Jonathan Legg, attached hereto and incorporated by reference.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested
under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

s/JONATHAN LEGG

_____
*Applicant's signature*

FBI Special Agent Jonathan Legg
_____
*Printed name and title*

Sworn to before me and signed in my presence.

s/ERIC I. LONG

Date: _____09/04/2018_____

_____
*Judge's signature*

City and state:  Urbana, Illinois

Hon. Eric I. Long, U.S. Magistrate Judge
_____
*Printed name and title*

AFFIDAVIT IN SUPPORT OF
AN APPLICATION FOR A SEARCH WARRANT

I, Jonathan Legg, being duly sworn, state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the

Federal Rules of Criminal Procedure for a search warrant authorizing the examination

of property-- electronic devices—which are currently in law enforcement possession,

and the extraction from that property of electronically stored information described in

Attachment B.

2.      I am a Special Agent with the Federal Bureau of Investigation ("FBI"), and

have been so employed since October 2017. I am currently assigned to the Springfield,

Illinois Division. My duties as a Special Agent with the FBI include investigating

criminal enterprises, drug crimes, and the violent crimes associated with criminal drug

enterprises. I have gained experience in the conduct of such investigations through

previous case investigations, formal training, and in consultation with law enforcement

partners in local, state, and federal law enforcement agencies. I have been trained in the

execution of search warrants to search and seize electronic devices, such as cellular

telephones and computers.

3.      This affidavit is based on my personal knowledge, as upon information

reported to me by other federal, state, and local law enforcement officers during the

course of their official duties, all of whom I believe to be truthful and reliable.

Throughout this affidavit, reference will be made to law enforcement officers. Law

1

enforcement officers are those federal, state, and local law enforcement officers who have directly participated in this investigation, and with whom your affiant has had regular contact regarding this investigation. This affidavit is also based upon information gained from interviews with cooperating citizen witnesses, whose reliability is established separately herein.

4.      I am an investigative law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, in that I am empowered by law to conduct investigations of and to make arrests for federal offenses.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

5.      The property to be searched is a silver iPhone currently held in the FBI evidence storage in Springfield, Illinois and tagged as 1B19, hereinafter referred to as "Device 1", and a black Samsung smartphone currently held in the FBI evidence storage in Springfield, Illinois and tagged as 1B18, hereinafter refered to as "Device 2," possessed by Calvert DAVIS at the time of his arrest on August 8, 2018. (collectively, the "Devices" and depicted more fully in "Attachment A")

## PROBABLE CAUSE

6.      On June 7, 2018, Agents of the East Central Illinois Task Force conducted an investigation in Mattoon, Coles County, Illinois.  The investigation resulted in the arrest of a Cooperating Witness (CW1) who was found to be in possession of approximately 13 ounces of crystal methamphetamine (hereinafter "ice").

7.      CW1 states that approximately 2 months ago, based on information which had been provided to him/her by DAVIS, DAVIS began traveling to the Las Vegas,

2

Nevada to acquire large quantities of ice that he would then send out to individuals at various locations. DAVIS had told CW1 those locations included Mattoon, Peoria, an unknown city in Ohio, and another location he had not told CW1. CW1's belief that DAVIS, in fact, travels to Las Vegas is supported by the fact that CW1 had sent cash in a priority mail package to DAVIS there in the past.

8.      During the interview, CW1 stated that he/she was scheduled to meet DAVIS later on June 7, 2018 to pay him $4,000 that CW1 had told DAVIS had been collected from the preliminary sales of the ice. CW1 agreed to record the conversation for law enforcement as CW1 paid DAVIS the partial money owed for the ice.

9.      On June 7, 2018, CW1 received a call from DAVIS and he requested CW1 meet with him at the Subway Restaurant in Charleston, Illinois. CW1 was instructed to advise DAVIS that he/she would be there. CW1 was outfitted with an eavesdropping/recording device to overhear and record his/her conversation with DAVIS.

10.     CW1 was followed by law enforcement from the Mattoon Police Department to the Subway Restaurant in Charleston. A short time later DAVIS, well known by ECITF Agents, arrived at the Subway in a white 2018 Dodge Challenger with California registration, later found to be an Enterprise rental vehicle. ECITF Agents observed DAVIS exiting his vehicle and entering CW1's vehicle. During the meeting, DAVIS was overheard (not verbatim) telling CW1 that he would be going to pick up more drugs soon and the more money CW1 could collect before he left, the more product he would be able to send CW1. DAVIS and CW1 also had a conversation

3

concerning the price of the last pound of ice being $12,000 and that he was working to try to get the price down to $10,000 per pound for all of the people he was supplying. DAVIS said it was his intention to make sure no one ran out.

11.     On June 14, 2018, FBI Special Agent (SA) Jon Legg provided CW1 with $8,000 U.S. Currency in prerecorded Federal funds to make a final payment to DAVIS for the money owed for the previous 1 pound of ice, which would presumably cause DAVIS to send CW1 an additional quantity of ice through the US Postal Service. CW1 called DAVIS and the phone call was monitored and recorded by law enforcement. CW1 informed DAVIS that he/she had money for DAVIS and wanted to know where he wanted to meet. DAVIS advised CW1 to come to the area of 10th and Jackson in Charleston, Illinois and he would meet CW1 there. CW1 was outfitted with an eavesdropping/recording device to overhear and record conversations with DAVIS. Under the surveillance of law enforcement, CW1 was followed to the area of 10th and Jackson in Charleston and Agents set up surveillance there. Agents observed DAVIS walking from between some houses on that block and he approached CW1's vehicle. CW1 provided DAVIS with the $8,000 that had been provided to him/her by SA Legg. DAVIS advised CW1 he would be leaving immediately and would notify CW1 when more was on the way. DAVIS also advised CW1 that he would be acquiring a new cellular phone and would let CW1 know the new number when he called. Following the delivery of the money to DAVIS, surveillance agents followed DAVIS and a female individual as they traveled north bound on Interstate 57.

12.     On July 19, 2018 FBI Task Force Officer (TFO) Chad Ramey consensually monitored telephone communications between an FBI Confidential Human Source 1 (CS1) and DAVIS. CS1 was able to reach DAVIS and speak with him by calling phone number ending in 1931. DAVIS indicated to CS1 that calling this phone number ending in 1931 was the method by which CS1 could reach him.

13.     From June 2018 to August 2018 period, a Confidential Witness (CW) was in contact with DAVIS on at least 3 different phone numbers, including the number ending in 1931, and discussed DAVIS' movements and plans to purchase drugs.

14.     On July 19, 2018 the United States District Court for the Central District of Illinois issued an arrest warrant for DAVIS for violation of Title 21, United States Code, Sections 846 and 841(b)(1)(A). On August 8, 2018 officers of the East Central Illinois Task Force arrested DAVIS on Charleston, Illinois pursuant to the aforementioned arrest warrant. At the time of his arrest, DAVIS possessed the Devices.

15.     Based on my training and experience, drug distributors are known to use multiple phone numbers to facilitate and conduct illegal drug transactions. DAVIS is known to use multiple phones, and was in contact via telephone with a Confidential Witness (CW) multiple times in the weeks leading up to his arrest.

16.     Based on this training and experience I know that:

a) It is common for drug traffickers to maintain books, records, receipts, notes, ledgers, travel documents, receipts relating to the purchase of financial instruments and or transportation, ordering, sale and distribution of controlled substances.  Such records are usually kept where the traffickers have ready access to them, and they are often kept for extended periods of time;

5

b) It is common for large scale traffickers to secrete contraband, proceeds from contraband sales and records of transactions in secure locations within their residences, businesses, and/or locations over which they maintain dominion and control in order to have ready access to them and to conceal them from law enforcement authorities;

c) In order to accomplish this concealment, traffickers construct hidden "stash" places within locations where they maintain dominion and control. A number of publications are available to the general public that contain instructions on how and where to construct such stash places and such publications have been found in the residences of drug traffickers by law enforcement officers executing search warrants;

d) It is common for large scale drug traffickers to maintain evidence regarding their obtaining, secreting, transfer, concealment, and/or expenditure of narcotics proceeds, including currency, financial records, financial instruments, jewelry and precious metals, books, records, invoices, receipts, records of real estate transactions, bank statements and related records, passbooks, safe-deposit box keys, money drafts, letters of credit, money orders, bank drafts, cashier's checks, bank checks, and money wrappers. These items are often maintained in traffickers' residences and other locations over which they exercise dominion and control, and they are often maintained for an extended period of time;

e) When drug traffickers amass significant proceeds from the sale and distribution of narcotics they often attempt to dissociate their assets from the source of their illegal activities through various money laundering activities. To accomplish these goals, drug traffickers use various means, including but not limited to domestic and international banks and their associated financial services, securities brokers, professional services from attorneys, accountants and financial consultants, casinos, real estate, shell corporations and business fronts and otherwise legitimate businesses which generate large quantities of currency;

f) Drug traffickers commonly maintain addresses or telephone numbers in books, papers, cellular telephone memory and/or cellular telephone memory cards which reflect names, addresses, and or telephone numbers for associates and customers;

g) Drug traffickers often take or cause to be taken photographs and other visual depictions of themselves, their associates, their property, and their product, and typically keep and maintain these photographs for extended time periods

6

in their residences and other locations where they exercise dominion and control;

h) Drug traffickers commonly have in their possession and at their residences and other locations where they exercise dominion and control firearms and ammunition, including but not limited to handguns, pistol revolvers, shotguns, machine guns and other weapons, as well as records or receipts relating to firearms and ammunition. These records are often kept for extended periods of time;

i) Large scale traffickers often use electronic devices, including computers, cellular telephones, electronic diaries, currency counting machines and cellular telephone answering machines to generate, transfer, count, record and or store information pertaining to the items described above and or to maintain contact with drug associates;

j) When drug traffickers use a device such as those referred to in this affidavit as an electronic device and or cellular phone in connection with drug trafficking, along with maintaining contact with drug associates, the devices will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. I believe that a device used to commit a crime of this type may contain: data that is evidence of how the computer was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of communications between parties to the crime; and other records that indicate the nature of the offense. Electronic devices have files and said files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

k) Wholly apart from user-generated files, electronic devices' storage media—in particular, devices' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application

7

2:18-mj-07152-EIL # 1 Page 9 of 15

operation, file system data structures, and virtual memory "swap" or paging files. Electronic device users typically do not erase or delete this evidence because special software is typically required for that task. However, it is technically possible to delete this information. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

l) The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.

## TECHNICAL TERMS

17.     Based on my training and experience, I use the following technical terms to convey the following meanings: Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitters/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.

Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

18.     GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records of the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

19.     Based on my knowledge, training, and experience, as well as conversations with other Special Agents of the Federal Bureau of Investigation, who are experienced with electronic communication systems, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the Devices. This information can sometimes be recovered with forensic tools.

20.     Forensic evidence. As further described in Attachment B, this application

seeks permission to locate not only electronically stored information that might serve as

direct evidence of the crimes described on the warrant, but also forensic evidence that

establishes how the devices were used, the purpose of use, who used it, and when.

21.     Nature of examination. Based on the foregoing, and consistent with Rule

41(e)(2)(B), the warrant I am applying for would permit the examination of the Devices

consistent with the warrant. The examination may require authorities to employ

techniques, including but not limited to, computer-assisted scans of the entire medium

that might expose many parts of the device to human inspection in order to determine

whether it is evidence described by the warrant.

22.     Manner of execution. Because this warrant seeks only permission to

examine the Devices already in law enforcement's possession, the execution of this

warrant does not involve the physical intrusion onto a premise. Consequently, I submit

there is reasonable cause for the Court to authorize execution of the warrant at any time

in the day or night.

## CONCLUSION

23.     Based on the facts contained within this affidavit, I believe that probably

cause exists to search Device 1 and Device 2, which are more particularly described in

Attachment A.

Respectfully submitted,
s/JONATHAN LEGG

Jonathan Legg
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me on September 4, 2018

s/ERIC I. LONG

HON. ERIC I. LONG
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

### Property to be Searched

The property to be searched is a silver iPhone currently held in the FBI evidence storage in Springfield, Illinois and tagged as 1B19, "Device 1", and a black Samsung smartphone currently held in the FBI evidence storage in Springfield, Illinois and tagged as 1B18, "Device 2," possessed by Calvert DAVIS at the time of his arrest on August 8, 2018. Depicted below.

 

 

## ATTACHMENT B

### Particular Things to be Seized

All records in the devices described in Attachment A that relate to violations of Title 21, United States Code, Section 846 and 841(b)(1)(A) involving Calvert DAVIS, and others unknown, to include:

a. contact records reflecting names, addresses, telephone numbers, pager numbers, fax numbers, email or other electronic contact information, and or telex numbers of co-conspirators, sources of supply, customers, financial institutions, and other individuals, businesses and institutions with whom a financial relationship exists;

b. types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

c. any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

d. any information recording schedule or travel information;

e. Photographs, including still photos, negatives, video tapes, films, electronic images, undeveloped film and the contents thereof, slides, and in particular photographs, etc., of co-conspirators, of assets, and or controlled substances;

f. Books, records receipts, notes, ledgers and other papers relating to the transportation, ordering, purchase and distribution of controlled substances, particularly methamphetamine;

g. Indicia of occupancy and or residency, rental and or ownership of the premises, including but not limited to utility and telephone bills, and rental, purchase or lease agreements;

h. tracking information, and other documents pertaining to deliveries or shipments of packages via express or priority mail or common carrier such as United Parcel Service or Federal Express.

Evidence of user attribution showing who used or owned the Device at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including and form of electronic storage and any photographic form.